In re Jerry L. **ICENHOWER** dba Seaview Properties, and Donna L. Icenhower, Debtors.

**Kismet Acquisition, LLC, a Delaware limited liability company, Successor-in-Interest to Gerald H. Davis, Chapter 7 Trustee, Plaintiff,**

v.

**Jerry L. Icenhower, an individual; et al., Defendants.**

Bankruptcy No. 03–11155–A7.
Adversary Nos. 04–90392–A7, 06–90369–A7.

United States Bankruptcy Court, S.D. California.

March 10, 2009.

Ali M.M. Mojdehi, Christine E. Baur, Janet D. Gertz, Baker & McKenzie LLP, San Diego, CA, Jeffrey Isaac Ehrlich, The Ehrlich Law Firm, Claremont, CA, for Plaintiff.

Jerry L. Icenhower, Coronado, CA, pro se.

Donna L. Icenhower, Coronado, CA, pro se.

Robert L. Rentto, Law Offices Of Robert L. Rentto, Alan Vanderhoff, Vanderhoff Law Group, D. Anthony Gaston, Attorney at Law, Stephen B. Morris, Morris and Associates, Geraldine A. Valdez, Jeffrey Isaacs, Procopio, Cory, Hargreaves & Savitch LLP, David J. Noonan, Kirby Noonan Lance & Hoge LLP, San Diego, CA, for Defendants.

Johnstown Enterprises, LLC, pro se.

Buckeye International Funding, Inc., pro se.

Western Financial Assets, Inc., pro se.

Martha Margarita, Barba De La Torre, pro se.

Columbus Enterprises, LLC, pro se.

Newark Enterprises, LLC, pro se.

### MEMORANDUM DECISION

LOUISE DeCARL ADLER, Judge.

### I.

### INTRODUCTION

At a hearing held in mid-November, 2008, this Court awarded compensatory damages for contempt against Alejandro Diaz–Barba and his mother Martha Barba de la Torre (the "Diaz Defendants").[1] Because of evidence adduced at that hearing, this Court issued a sua sponte Expanded Order to Show Cause Re: Contempt ("Expanded OSC") ordering certain of their attorneys to show cause why they should not be held jointly and severally liable for those contempt sanctions.

Evidentiary hearings on the Expanded OSC were held January 6, 13 and 27, 2009.

Based upon the documentary and testimonial evidence presented, the Court concluded that two of the counsel—Stephen Morris and Anthony Gaston—should not be held jointly liable for the sanctions. As to the remaining respondents ("the Procopio Attorneys") based on clear and convincing evidence, the Court concludes Geraldine Valdez ("Ms.Valdez") should be held jointly and severally liable for the sanctions; Enrique Hernandez Pulido ("Mr.Hernandez"), although culpable to a degree, should suffer a lesser sanction, and Patrick Martin ("Mr.Martin"), although negligent, should not be sanctioned for his conduct.

### II.

### FACTUAL BACKGROUND

Prior to filing their chapter 7 bankruptcy case, Jerry and Donna Icenhower ("Debtors") owned a beneficial interest in a *fideicomiso* trust [2] holding title to coastal real property in Mexico known as the Villa Vista Hermosa ("Villa Property"). They created a sham corporation and fraudulently transferred their *fideicomiso* trust interest to the sham corporation. Then, postpetition, they caused the sham corporation to transfer its interest in *the fideicomiso* trust to the Diaz Defendants. The Chapter 7 trustee ("Trustee") commenced litigation against the sham corporation and the Diaz Defendants to avoid and recover the fraudulent transfer, and to avoid and recover the postpetition transfer to the Diaz Defendants.

Kismet purchased from the Trustee all of the assets of the bankruptcy estate, including the pending avoidance actions,

---

1. Adv. Proc. 04–90392, D.E. # 710; Adv. Proc. 06–90369, D.E. # 420. Hereinafter, all references to the docket will be to Adversary Proceeding 04–90392, unless otherwise specified.

2. Under Mexican law, a foreign national may not directly hold title to coastal real property in Mexico, but may hold the beneficial interest in a *fideicomiso* bank trust formed to hold title to the real property.

and substituted in to these actions as the real party in interest. The actions were tried and, on June 2, 2008, the Court entered its Consolidated Findings of Fact and Conclusions of Law ("FFCL") and a Consolidated Judgment in favor of Kismet.[3]

The Consolidated Judgment directs the Diaz Defendants to execute and deliver any and all documents needed to undo the avoided transfer, and to take all actions necessary to cause the property to be reconveyed to a *fideicomiso* trust naming Kismet as the sole beneficiary for the benefit of the bankruptcy estate. The Consolidated FFCL rejected the Diaz Defendants' contention of lack of jurisdiction to affect title to the Villa Property. It explains that the Court has subject matter jurisdiction over claims to avoid and recover the wrongful transfer of the Debtors' interest in .the *fideicomiso* trust. Additionally, the Court has *in personam* jurisdiction over the Diaz Defendants to order them to execute the necessary transfer documents, subject to enforcement through this Court's contempt powers, even though the transfer would indirectly affect title to real property in Mexico.[4] The Court expressly made no legal conclusion concerning whether its Consolidated Judgment is enforceable in Mexico.[5]

### A. *Motions to Clarify, or to Alter or Amend.*

Neither side was satisfied with the Court's ruling. Accordingly, on June 16, 2008, both Kismet and the Diaz Defendants filed motions to clarify, or to alter or amend, the Consolidated Judgment.[6] Kismet's motion requested, *inter alia*, an order clarifying that the preliminary injunction prohibiting transfer of the Villa Property would remain in effect until the Diaz Defendants fully complied with the Consolidated Judgment. That motion was granted, and an Order Clarifying Consolidated Judgment was entered on June 16, 2008 ("Order Continuing Preliminary Injunction").[7]

The Diaz Defendants' motion requested additional factual findings and alteration of the Consolidated Judgment. Further, by separate motion they sought and obtained a temporary stay of enforcement of the Consolidated Judgment pending the decision on their motion to amend, which they scheduled for a hearing on July 24, 2008. As the Diaz Defendants have put it, the hearing on their motion to amend did not go well for them. The Court denied the bulk of their motion, granting only a limited request to amend the Consolidated Judgment to clarify that "all references to the transfer or sale of the Villa Property

---

3. D.E.# 503; # 504.

4. D.E. # 503 at ¶ 108.

5. *Id.*

6. D.E. # 505; # 507–509.

7. D.E. # 514. The Preliminary Injunction provides, *inter alia*:

[T]he Diaz Defendants, and each of them, and their respective agents, servants, employees, partners, representatives, independent contractors, lessees, assigns, *attorneys and all*

*other persons in active concert and/or participation with any of them*, are hereby restrained and enjoined from doing, directly or indirectly, any of the following:
 a. Expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering, concealing, disposing of, secreting, *or in any other way diverting, using or making unavailable, or in any manner whatsoever dealing in or disposing of* the whole or any part of the Villa Property and/or of any interest in the Villa Property Trust. . . .
[D.E. # 72 (emphasis added)]

refer to the transfer or sale of the beneficial trust interest."[8]

Prior to the hearing, Procopio, Cory, Hargreaves & Savitch LLP ("Procopio Law Firm") associated in to serve as co-counsel of record for the Diaz Defendants.[9] Ms. Valdez, a Procopio Attorney who specializes in bankruptcy law and practice, filed the Association of Counsel on behalf of the Procopio Law Firm. Ms. Valdez appears to be the only bankruptcy specialist from the Procopio Law Firm handling the case during the months identified in the Expanded OSC. Ms. Valdez indicates that she had been monitoring the case for several months prior to filing the Association of Counsel, so she was familiar with the case. She attended the July 24, 2008 hearing but did not argue the motion.

On July 30, 2008, the Court entered its Order on Motion to Alter or Amend Consolidated Judgment incorporating the clarification made at the July 24, 2008 hearing, and attaching as Exhibit "A" the Amended Consolidated Judgment ("ACJ").[10] The ACJ does *not* reflect that an Order Continuing Preliminary Injunction had also been entered. The significance of this omission in the ACJ will be discussed more fully below.

**B.** *The Motions for Stay Pending Appeal.*

Following entry of the ACJ, the Diaz Defendants unsuccessfully applied to this Court for a stay of enforcement pending appeal They made the same motion to the district court and obtained a temporary stay pending the hearing on their motion for stay pending appeal set for August 28, 2008. At the hearing, Kismet argued that the case of *Brady v. Brown,* 51 F.3d 810 (9th Cir.1995) holds a U.S. court order directing the transfer of Mexican real property to a *fideicomiso* trust does not violate Mexican law. The district court took the matter under submission for further review before making a decision.[11] The next day, Ms. Valdez reviewed *Brady v. Brown* and concluded by way of an email sent to Mr. Gaston and Mr. Diaz, copied to Mr. Martin and Mr. Hernandez: "It is not a good case for us so I just wanted to give you the heads up."[12] Likewise, Mr. Gaston reviewed *Brady v. Brown* and reported to Ms. Barba de la Torre in an email, copied to Mr. Hernandez and Ms. Valdez:

> This case [*Brady v. Brown*] is a 9th Circuit opinion that basically says the judgment that Judge Adler entered against you and Alex does not violate either U.S. or Mexican law. There are some minor factual differences, but taken as a whole, it appears to validate Judge Adler's order requiring you to recreate the fideicomiso to the benefit of Kismet. . . .

> What we have here is a situation where the U.S. Courts, including the 9th Cir-

---

8. D.E. # 529.

9. The Association of Counsel provides the Procopio Law Firm will be "joint co-counsel" for Mr. Diaz and Ms. Barba de la Torre along with Stephen Morris and Anthony Gaston. [D.E. # 528; # 535] The Court had understood that the Procopio Law Firm represented only Mr. Diaz.

10. D.E. # 530.

11. D.E. # 649, Ex. 12 at DIAZ2671. Hereinafter, the exhibits attached to D.E. # 649 shall be referred to as the "Expanded OSC Exhibits" because they form the factual basis for the Expanded OSC. The Expanded OSC Exhibits include copies of correspondence between the Diaz Defendants, the Procopio Attorneys, and others acting on behalf of the Diaz Defendants, which were produced in response to the Court's prior ruling that the attorney-client privilege had been waived.

12. *Id.*

cuit Court of Appeals, contend that they have the power to enter orders and judgments directly affecting rights of Mexican Citizens and others in Mexican coastal real properties. The Mexican government disagrees and contends that only Mexican law and its courts have such power.... It is essential that the Mexican Government now take a position on this judgment.... The draft of declaration [to be signed by Joel Hernandez Garcia, Legal Advisor in the Mexican Ministry of Foreign Affairs] is very rough and really just a specimen of what I would like to have if Judge Moskowitz refuses to extend the stay and we are forced to object to contempt sanctions.... [*Id.* at DIAZ 1481]

There is nothing in the Expanded OSC Exhibits or the response filed by the Procopio Attorneys evidencing that Ms. Valdez disagreed with her joint co-counsel's analysis of the *Brady* case, or his assessment of their appeal, at the time he sent this email. In her testimony at the hearing, Ms. Valdez disavowed that she agreed with Mr. Gaston's email. Given the totality of the evidence, the Court does not find her after-the-fact testimony credible. By Memorandum Decision dated September 3, 2008, the district court denied their motion for a stay pending appeal. Ms. Valdez's email to Mr. Diaz dated September 3, 2008, copied to Mr. Gaston, Mr. Hernandez and Mr. Martin, confirms that she believed *Brady v. Brown* was likely the reason the district court denied their stay pending appeal, and their only hope was to obtain the "relevant documents and opinions from the Mexican government that we have been discussing."[13] Ms. Valdez recognized that time was of the essence because the Diaz Defendants had only ten days to comply with the ACJ.

## C. *The Evolution from "Declaratory Relief" to an "Injunction."*

For the most part, the actions giving rise to the Expanded OSC emanate from the actions taken by the Procopio Attorneys after the stay pending appeal was terminated. Each of the Procopio Attorneys recognized that the denial of the stay meant the Diaz Defendants would likely face a situation where they must comply with the ACJ before their appeal was decided. However, their efforts to represent their client's interest in such a situation, and their understanding of the legal issues which were implicated, were slightly different. For this reason, the Court will independently examine the conduct of each Procopio Attorney:

1. *Geraldine Valdez:* Initially, the efforts of Ms. Valdez were to encourage Mr. Diaz to comply with the ACJ, and to avoid having him cited for contempt of court. Ms. Valdez testified that she wanted to have defenses he could raise in his pending appeal, and in response to an order to show cause why he should not be cited for contempt. She claims that to that end, she was urging Mr. Diaz to obtain some sort of pronouncement from the Mexican government to the effect that the transfer under the ACJ could not be accomplished. She testified that she believed this pronouncement would be in the nature of "declaratory relief" from the Mexican government. Ms. Valdez's September 3, 2008 email to Mr. Diaz, copied to Mr. Martin, Mr. Hernandez and Mr. Gaston, informing him of the district court's termination of the stay pending appeal confirms she was initially urging advisory "opinions" to ensure that the ACJ could not be accomplished:

> [Y]ou will now have to expedite obtaining the *relevant documents and opinions* from the Mexican government that

---

13. Expanded OSC Ex. 14 at DIAZ1640.

**50**

we have been discussing. [Expanded OSC Ex. 36 at DIAZ2649 (emphasis added)]

In response to her September 3, 2008 email, Mr. Martin warned her to be cautious:

"Are you taking steps to make sure we are not in violation of the court order while the appeal is appending (especially if legal counsel in Mexico is telling us that the order can not be accomplished)?" [*Id.* at DIAZ2648]

Ms. Valdez responded to Mr. Martin the next day, stating:

I am not sure what kind of steps I can take to make sure we are not in violation of the court order while the appeal is pending. Kismet will take the position that if Alex doesn't turn the property over within ten days, he is in contempt and is in violation of the order.... *I think the only thing we can do now is to work with the Mexican authorities to try to ensure that the order cannot be accomplished.* Otherwise, Judge Adler will find Alex in contempt. [*Id.* (emphasis added)]

Some of Ms. Valdez's post-September 3 efforts focused on the defects she saw in the transfer documents which Kismet presented for signature. For example, when Kismet sent transfer documents which would have transferred the Diaz Defendants' interest to Axolotl, a Mexican corporation, instead of Kismet (thereby obviating the need for a *fideicomiso* trust permit), Ms. Valdez responded to Kismet's counsel that the transferee would have to be Kismet, not Axolotl, because the ACJ directed the transfer to Kismet. Ms. Valdez's objections to the form of the documents were, for the most part, facially meritorious and there is no evidence she unduly delayed in communicating her objections to Kismet.

Notwithstanding, Ms. Valdez's *motive* for objecting was tainted by bad faith. The Court finds that Ms. Valdez understood Mr. Diaz did not likely intend to sign any transfer documents. In her email correspondence dated September 5, 2008, Ms. Valdez informed Mr. Hernandez and Mr. Martin she had learned Ms. Barba de la Torre is "putting her affairs in order and planning on returning to Mexico." She said that Alex is "considering this avenue as well."[14] Further, in response to Mr. Diaz's email dated September 8, 2008 stating he "will not sign anything that executes a trust agreement to Mr. Hahn [Kismet's principal], any of his companies, etc....," Ms. Valdez responded:

I understand that but we don't need to reveal it to Mojdehi yet. Better let him think we are preparing to cooperate while we get our ducks in a row in Mexico. Therefore, to the extent Arturo [Mr. Diaz's Mexican attorney] can point to defects, we can send back the draft document and make them change it causing additional delay. [Expanded OSC Ex. 43 at DIAZ2603][15]

Ms. Valdez now claims she understood this email to mean Mr. Diaz would not sign anything that transferred the Villa Property to Mr. Hahn, or any of his companies *other than Kismet.* This is not what Mr. Diaz stated in his email. Moreover, it does not change Ms. Valdez's response which plainly states her bad faith motive to let Mr. Mojdehi *think they* are preparing to cooperate while they get their "ducks in row" in Mexico, by sending back the transfer documents and making them change it *to cause additional delay.*

---

**14.** Expanded OSC Ex. 18 at DIAZ2625–26.

**15.** Martin and Mr. Hernandez were *not* part of this email chain.

Ms. Valdez claims that Mr. Diaz ran "hot and cold" on whether he would comply. She claims that based upon their *oral* conversations, she was hopeful he would sign the transfer documents if faced with a situation where he must comply. Ms. Valdez's September 15, 2008 email does not reflect any hope that Mr. Diaz would turn over the Villa Property anytime soon. This email explained to Mr. Martin why Mr. Diaz would have a § 502(h) claim for return of the purchase price if he complied with the ACJ. Further, she explained her belief that Kismet must pay the § 502(h) claim in full given its agreement with the Trustee. She then concluded: "It is likely that this whole claim scenario will never arise since Alex has absolutely no intention right now of turning over the property." [16]

Ms. Valdez obviously recognized she had an ethical dilemma in representing a client who did not intend to sign the transfer documents. On September 23, 2008 she contacted Robert Russell ("M .Russell"), the Procopio Law Firm's professional standards partner, for advice. Ms. Valdez informed Mr. Russell she was concerned Mr. Diaz may refuse to execute the transfer documents; she needed an opinion whether the firm should continue to represent Mr. Diaz under these circumstances.[17] Mr. Russell responded by email, copied to Mr. Martin, stating:

> In your opinion, is the reputation of Procopio, Cory likely to be tarnished by our representation of an individual who refuses to comply with the Bankruptcy Court's order and is held in contempt? Are all of our bankruptcy practitioners aware of this circumstance and comfortable with it?[Expanded OSC Ex. 54 at DIAZ2432]

Ms. Valdez's response was that she was comfortable with the objections she had made to the form of the documents. However, she was not comfortable making these objections if Mr. Diaz did not intend to sign the documents even if they were revised.[18] The next day Mr. Russell emailed and asked Ms. Valdez and Mr. Martin to "talk." Further, he asked:

> Implicit in your argument that they [Kismet] haven't done it right is that when they do it right, your client will comply. But if your client has no intention of complying, then how do you respond when Louise asks you why [you] made everyone go through the hoops if your client had no intention of complying any way. [*Id.*]

Ms. Valdez responded that she had just learned from Mr. Diaz that he had filed an *amparo* suit in Mexico. She explained:

> It makes me much more comfortable now that a Mexican court has exercised jurisdiction over the property. As I understand it, there are only two ways that Mexican coastal property can be transferred to a foreign entity—voluntarily by way of a contractual agreement (i.e. The fideicomiso trust) or involuntarily by way of an order of a Mexican court.
>
> Mojdehi wants Alex to execute the fideicomiso trust in which he will have to make representations that he is voluntarily transferring the property. Alex cannot do that because there is no voluntary transfer—he is being ordered to do this by Judge Adler. Therefore, the only way that he can comply with the order is by having a Mexican court issue an order to transfer the property. The purpose of this lawsuit is to get a court determination as to whether such an

16. Ex. 47 at DIAZ2473.

17. D.E. # 765, R. Russell Decl. at ¶ 4.

18. *Id.* at DIAZ2431.

involuntary transfer will be upheld by the Mexican courts.

I think this makes a much more credible case as to why Alex has been unable to comply with the order yet. [*Id.*]

Accordingly, Ms. Valdez did not resolve her ethical dilemma that she was representing a client who said he had no intention of signing the transfer documents she was negotiating to revise. It appears she believed the *amparo* would determine Mr. Diaz could not transfer the Villa Property, thereby shifting the focus from one of noncompliance to that of impossibility.[19]

The Court recognizes that Ms. Valdez had a duty to raise meritorious objections to the transfer documents. However, it finds that Ms. Valdez did not believe Mr. Diaz had any intention of signing any transfer documents *at the time she raised her objections.* The Court is troubled by her bad faith motive in objecting to the transfer documents her client did not intend to sign. However, because some of her objections were meritorious, and there is evidence she was trying to persuade him to comply, it will not impose joint and several liability for this conduct alone.

Additionally, the Court recognizes Ms. Valdez had a difficult client in Mr. Diaz. He was listening to a number of lawyers, including: his cousin Andres Barba who is a lawyer in Mexico; sometimes the Mexican law firm of Guerra, Gonzalez y Asociados, S.C. (the "Guerra Firm"); sometimes Pedro Salinas Arrambide, another Mexican lawyer; and sometimes friends in the judicial system in Mexico, as well as the Procopio Attorneys. Additionally, his mother employed Mr. Gaston as her separate counsel, and he sometimes included Mr.

Diaz in his communications. As well, Mr. Gaston was consulting with Arturo Dager, a Mexican lawyer who appears to have been employed by both Mr. Diaz and Ms. Barba de la Torre. Mr. Dager was attempting to obtain the signature of an official of the Mexican Ministry of Foreign Affairs (the "SRE") on a statement to the effect that the ACJ violated the Mexican Constitution. Mr. Diaz believed he was the victim of a "great international injustice"; he was prepared to correct this injustice through endless litigation. Mr. Diaz had unrealistic expectations regarding what he could achieve. He wanted to retain ownership of the Villa Property and recover his purchase price from Kismet.[20] Mr. Martin's September 15, 2008 email to Ms. Valdez expressed that Mr. Diaz was looking for a result that would never happen, and Mr. Diaz would never be satisfied.[21] Mr. Martin recommended that they should start figuring out a way to get out of the case, sooner rather than later.[22]

Unfortunately, the Procopio Attorneys did not figure out a way to get out of the case. Kismet was tiring of responding to the many objections to the form of transfer documents, and Ms. Valdez recognized that Kismet would soon move for a contempt citation. As the prospect of a contempt citation ripened, Ms. Valdez's advice metamorphosed from advising Mr. Diaz to obtain "opinions" in the nature of declaratory relief, to advising him to obtain an "injunction" to block performance of the ACJ. Ms. Valdez testified that she knows the difference between declaratory relief and an injunction; in her own words, an injunction "tells somebody that they can't

---

19. As more fully discussed below, Ms. Valdez believed the *amparo* functioned as an "injunction" to block the transfer of the Villa Property.

20. Expanded OSC Ex. 47 at DIAZ2473–2474.

21. *Id.*

22. *Id.*

do something."[23] While she testified at length about how she was not intending to obtain an injunction to block or impair Mr. Diaz's performance of the ACJ, the email correspondence paints a different picture:

- Ms. Valdez's September 12, 2008 email to Mr. Diaz, copied to Mr. Martin and Mr. Hernandez, asks, "Is this the lawsuit that we are planning to *get the injunction* in?" [Expanded OSC Ex. 47 at DIAZ2476 (emphasis added)]

- In another September 12, 2008 email to Mr. Diaz, copied to Mr. Martin and Mr. Hernandez, Ms. Valdez states: "In the meantime we must immediately get the lawsuit going in Mexico so we can *get that injunction.* If you want to go after Wolfgang Hahn in Mexico to strip him of his property ... that is your choice but that needs to be a second priority." [*Id.* at DIAZ2474 (emphasis added)]

- In another email to Mr. Diaz later that night, copied to Mr. Martin and Mr. Hernandez, Ms. Valdez states: "As we discussed on the telephone with Patrick [Martin] yesterday, we need to immediately commence an action against the Icenhowers and maybe the Lonies in Mexico. This is because we must get a Mexican court to *issue an injunction* preventing you from transferring the property. This should be the priority right now because we will not be able to stave off a motion for contempt much longer." [*Id.* at DIAZ2475 (emphasis added)]

Each of the above emails used the term "injunction" instead of "opinion" or "declaratory relief."

Ms. Valdez continued to pressure Mr. Diaz to file an action in Mexico so he would not be cited for contempt of court.

Her September 23, 2008 email to Mr. Diaz states:

Attached is the latest communication from Ali Mojdehi [Kismet's lawyer]. From its tone, it is apparent that he is getting ready to obtain an order to show cause why you and Martha should not be sanctioned for contempt for failure to comply with Judge Adler's judgment. *We have managed to delay this now for two months* and will contest any application for the order to show cause on the grounds we have discussed. However, there are no guarantees as to how Judge Adler will respond. Therefore, *it is imperative that you immediately take all necessary steps to obtain the orders we have discussed from the Mexican courts.* [Expanded OSC Ex. 56 at DIAZ2442 (emphasis added)]

As indicated above, the "orders" they had discussed included getting an "injunction" to prevent Mr. Diaz from transferring the Villa Property.[24] Likewise, Ms. Valdez's formal strategy letter to Mr. Diaz dated September 23, 2008, copied to Mr. Martin and Mr. Hernandez, advised him to immediately obtain an "injunction prohibiting the transfer of the Villa Property":

Dear Alex:

As you know, many discussions have taken place recently regarding the most effective strategy to pursue in the above litigation. This letter is to summarize the different strategies we have discussed, where we are going with them and some of the legal risks associated with each strategy.

**A. United States Strategies And Risks**

*1. Contempt Sanctions*

---

**23.** Expanded OSC Hr'g Tr., 19:4, Jan. 13, 2009.

**24.** Expanded OSC Ex. 47 at DIAZ2475.

U.S. District Court Judge Moskowitz, as you know, denied the motion for a stay pending appeal. Therefore you are legally obligated to comply with Judge Adler's order.... [I]t is apparent that Kismet is getting impatient. I think we can expect ... an order to show cause why you and your mother should not be sanctioned for contempt ... shortly. We have several defenses—first ... [explains incorrect theory that the judgment was never entered].

Second, I have set the stage in my letters to Mojdehi to argue that the papers he is demanding that you sign do not comply with the judgment ... [explains]. However, *these defenses will only buy us some time.* You are ultimately going to have to deal with the inevitability that Judge Adler will likely issue sanctions against you *unless you can provide an injunction or order from a Mexican court demonstrating that it is impossible for you to comply under Mexican law* ....

....

### B. *Mexican Law Strategies*

While we appear to be on the same page regarding the efforts that Arturo Dager is pursuing with the Mexican Government, there are some conflicting views between your U.S. lawyers and your-Mexican lawyers, as to how to proceed .... [advises do not sue Judge Adler].

However you and your Mexican lawyers decide to proceed, one thing is clear.... *[I]t is imperative that you commence an action in the Mexican Courts to obtain some kind of an injunction prohibiting the transfer of the Villa Property as a matter of Mexican law* .... I

cannot stress how important it is to get such an action in motion *immediately* because we are running out of time.... [Respondents' Ex. N]

On September 26, 2008, Mr. Diaz emailed Ms. Valdez and copied Mr. Hernandez and Mr. Martin with news of the "injunction":

The Amparo has been admitted, and *we were granted a cautionary measure (injunction), which consists in [sic] an order from a federal judge to [say] that the transmission of the property not be carried out.* This is the extract that appears on the internet, in the Fifth District Court in Administrative Matters in the State of "Jalisco"—Lie. Andres Barba.... [Expanded OSC Ex. 57 at DIA22418 (forwarding Mr. Barba's email)(emphasis added) ]

Ms. Valdez responded to Mr. Diaz, with copies to Mr. Martin and others as follows:

*This appears to be good news.* Please get us certified copies of what was filed and what was issued by the Judge immediately so we can get certified translations of the documents prepared. [*Id.* at DIAZ2418 (emphasis added) ]

From the wording of this email, it is apparent Ms. Valdez understood the injunction was obtained *ex parte* without notice to Kismet's counsel, and she encouraged Mr. Diaz and Mr. Barba to continue the concealment from Kismet's counsel.[25]

Then, on September 30, 2008, there was a meeting among Ms. Valdez, Mr. Morris, Mr. Gaston and Mr. Hernandez. The purposes of the meeting were to discuss production of discovery which the Court had ordered them to produce, and the strategy for defense of the OSC Re: Contempt. It

---

**25.** While this Court has no idea whether due process under Mexican law requires notice to opposing parties of a request for an injunction, Ms. Valdez would have known that un-der United States law such notice would be required, absent a showing of immediate and irreparable injury, loss, or damage. *See* Fed. R.Civ.P. 65(b)(1)(A).

is admitted that the *amparo,* and its function, was discussed. The meeting culminated in an email sent by Mr. Hernandez to Mr. Diaz and others, stating:

> Dear Alex,
>
> We had a meeting with Steve [Morris], Tony [Gaston], Geraldine [Valdez] and *I explained to them the amparo resolution you obtained and how the injunction order can be recorded* in the Public Recorder's Office. We concluded that: 1) *We will not let the U.S. court nor Kismet's attorneys at this point know that the amparo was filed and the injunction obtained.* We want to avoid Kismet arguing against it until we have it recorded. We will want to have the certificate of recording of the amparo judge's order handy when it is available to *present it as an obstacle for transferring title* .... [Expanded OSC Ex. 60 at DIAZ4048 (emphasis added)]

Ms. Valdez was not copied on Mr. Hernandez's email and none of the Procopio Attorneys has admitted that this email reflects their conclusion at the meeting. However, the email's characterization of the *amparo* as an "injunction" that they could "present as an obstacle for transferring title" is consistent with Ms. Valdez's earlier emails, and her understanding of what an injunction does. Moreover, that evening Ms. Valdez arranged a conference call with Mr. Diaz and his attorneys in the United States and Mexico to take place on October 1, 2008.[26] It appears that one of the topics discussed was the injunction obtained in Mexico because Mr. Gaston, who participated in that call, responded to Ms. Valdez, Mr. Diaz and others:

> *I'm uncomfortable with the Amparo. As I understand it, the Amparo is like a self-imposed injunction* or lis pendens that will cloud the title until Alex or the

Mexican court removes it. The thrust of our arguments and defenses to the OSC is that compliance is impossible through not [sic] fault or act on our part.... My concerns are: 1) the whole concept of an Amparo is totally foreign to our system and just explaining it to Judge Adler will be a challenge, and 2) *it looks like something we affirmatively did to block or hinder compliance with the judgment. How do we deal with this?* [Expanded OSC Ex. 61 at D1AZ2225 (emphasis added)]

Based upon the collective evidence above, the Court does not find credible Ms. Valdez's after-the-fact testimony that she intended to obtain only an advisory opinion or a declaratory determination that the transfer could not be accomplished under Mexican law. Ms. Valdez repeatedly advised Mr. Diaz to obtain an "injunction" preventing Mr. Diaz from transferring the Villa Property. It is immaterial that Ms. Valdez did not understand the true function of an *amparo* proceeding. Even though Ms. Valdez's understanding was erroneous, she clearly intended that this proceeding would result in an "injunction" preventing the transfer of the Villa Property.

The Court concludes that Ms. Valdez should be held jointly and severally liable with her client for her conscious bad faith conduct in this case. Ms. Valdez was the attorney in charge of representing Mr. Diaz in these bankruptcy proceedings. The evidence is clear and convincing that she advised and encouraged Mr. Diaz to collaterally attack the ACJ in Mexico by obtaining an "injunction" preventing his ability to transfer the Villa Property. Her conduct was an improper attack on the ACJ which unreasonably and vexatiously multiplied the proceeding before the

---

26. Expanded OSC Ex. 61 at DIAZ2226.

Court, and it also violated the Order Continuing Preliminary Injunction discussed below.

2. **Patrick Martin:** Mr. Martin was the originating attorney; he made the initial contact with the Diaz Defendants in March 2008 concerning the international law aspects of the case. He then asked Ms. Valdez to review the bankruptcy law aspects of the case, and she billed 43.5 hours on the matter in the months of March and April 2008. Mr. Martin also brought in Kendra Hall ("Ms.Hall"), an appellate specialist, to handle the possible appellate issues. On July 2, 2008, Mr. Martin and others at the Procopio Law Firm met again with Mr. Diaz to discuss the case, but the firm was not formally retained until later that month. Mr. Martin testified that once Mr. Diaz agreed to hire the Procopio Law Firm, Ms. Valdez became the "point person" for the client as his area of expertise is international taxation. His time records corroborate that he had limited involvement in the matter.

Despite his limited involvement, Mr. Martin did have knowledge of the terms of the ACJ; he had read it and was concerned that should the Diaz Defendants perform the ACJ, they might be in conflict with Mexican legal requirements for transfers of property into *fideicomiso* trusts. In early August 2008, he urged Mr. Diaz to contact the Guerra Firm, a highly-regarded Mexican litigation firm, to determine whether it was possible to obtain an opinion from a Mexican judge that compliance with the ACJ would be in violation of Mexican law.[27] Because Mr. Diaz appeared to be delaying, on September 9, 2008, Mr. Martin contacted a colleague at the Guerra Firm, sent him the ACJ and the Consolidated FFCL, and asked him to analyze the ACJ and make recommendations as to how the Diaz Defendants might proceed in Mexico.[28] On September 11, 2008, the Guerra Firm issued a lengthy opinion letter.[29] In essence, the Guerra Firm's advice was that a declaratory relief action should be filed in Mexico:

> Our offensive litigation strategy would be to advise client and legal owner of the property to file a *declarative judgment* in the State Court of Jalisco by which Court will determine that the Diaz party is in fact legal proprietor of such land and constructions and thus is entitled to maintain legal possession thereof until a third party proves in such Court to have better title to such property.
>
> . . . .
>
> Finally, it is our strong recommendation that [the] client maintain at this crucial time possession of the land by not renting it or handing over possession of [the] property in any legal way or form to any third parties. [*Id.* (emphasis added)]

In a September 12, 2008 email forwarding the opinion letter to Mr. Diaz, with copies to Mr. Hernandez and Ms. Valdez, Mr. Martin stated he wanted to discuss the recommendations of the Guerra Firm, but added: *"[W]e do not want to be in violation of Judge Adler's order and it seems that her order might indeed conflict with a Mexican court's order."* [30] When examined about that statement, Mr. Martin conceded there was no actual Mexican court order in existence at the time he wrote that email. Rather, he claims he was referring to the possibility of a conflict which could exist should Mr. Diaz be successful in getting a declaratory judgment from a Mexican court. In other words, it appears

27. Respondents' Ex. P at DIAZ1969.

28. Respondents' Ex. T.

29. Respondents' Ex. Q.

30. Respondents' Ex. U (emphasis added).

he intended to *create* a conflict with the ACJ by obtaining the declaratory judgment from the Mexican court. In cross-examination, Mr. Martin was adamant that he did not understand, or intend, that the declaratory relief action would result in any type of injunction blocking the transfer of the Villa Property.

The Guerra Firm's opinion letter was the subject of a September 15, 2008 conference call among Mr. Martin, Lic. Roberto Vega of the Guerra Firm, Mr. Diaz and one of Mr. Diaz's Mexican counsel. Because the conference call was in Spanish and Ms. Valdez does not speak Spanish, Ms. Valdez participated only briefly in the call. At the conclusion of the telephone conference, Mr. Martin believed that Mr. Diaz was going to hire the Guerra Firm to pursue their recommended course of action. However, Mr. Diaz would not abandon his reliance on his cousin, Andres Barba, and the Guerra Firm declined to work as co-counsel with Mr. Barba.

On September 16, 2008, Mr. Diaz forwarded to Mr. Martin and Mr. Hernandez a copy of an *amparo* action filed by Mr. Barba in the District Court in Jalisco, Mexico. On September 17, 2008, Mr. Hernandez emailed Mr. Martin, observing this was a "waste of time"; Mr. Martin responded that he "agreed," and he forwarded the emails to Mr. Diaz and Ms. Valdez without comment.[31] Mr. Martin's agreement was based on his understanding that an *amparo* action is merely an action under the Mexican Constitution which could be taken if there had been an attempt to *homologate*[32] the ACJ in Mexico. Since there had been no effort to homologate the ACJ, he believed an *amparo* action would be ineffective against the ACJ. After that date, Mr. Martin states he had no further contact with Mr. Diaz. He said he was "frustrated" because the client was not following his advice. Mr. Martin's prior email to Ms. Valdez confirms he wanted to get out of representing Mr. Diaz, sooner rather than later.[33]

Notwithstanding his limited role in the case, Mr. Martin received copies of various emails apprising him of the activities of his colleagues, Mr. Hernandez and Ms. Valdez. Among the emails he received were Ms. Valdez's series of exhortations to Mr. Diaz to "get an injunction" in Mexico prohibiting transfer of the property.[34] Mr. Martin also received a copy of Ms. Valdez's lengthy strategy letter to Mr. Diaz dated September 23, 2008 advising Mr. Diaz to obtain an injunction "prohibiting the transfer of the Villa Property":

> However you and your Mexican lawyers decide to proceed, one thing is clear—in order to have any chance at avoiding sanctions while you continue to pursue the appeal, *it is imperative that you commence an action in the Mexican Courts to obtain some kind of an injunction prohibiting the transfer of the Villa Property as a matter of Mexican law.* Patrick [Martin] and Enrique [Hernandez] have discussed with you in detail, various ways of accomplishing this. [Respondents' Ex. N] [emphasis added]

Mr. Martin testified that despite receiving these emails and a copy of the strategy letter, he did not discuss with Ms. Valdez any concern that obtaining an injunction (as opposed to declaratory relief) might violate the ACJ.

---

31. Respondents' Ex. R.

32. *"Homologation"* or homologation is the Mexican law equivalent of domestication of a foreign judgment.

33. *See* Expanded OSC Ex. 47 at DIAZ2473–74.

34. *Id.* at 2475.

Additionally, Mr. Martin received a copy of Mr. Diaz's September 26, 2008 email to Ms. Valdez announcing that: "The Amparo has been admitted and we were granted a cautionary measure (injunction) which consists of an order from a federal judge to [say] that the transmission of the property not be carried out. . . ." [35] And, he was also copied with Ms. Valdez's response proclaiming that "[t]his appears to be good news." [36] Still Mr. Martin did not caution Ms. Valdez that an injunction could violate the ACJ. Rather, Mr. Martin testified that Ms. Valdez's response caused him to feel that it was clear to him she did not understand what an *amparo* was. There is no testimony that he ever explained it to her.

Mr. Martin also received copies of various emails on September 29, 2008 and September 30, 2008 discussing an "injunction." Mr. Diaz's September 29, 2008 email informed each of the Procopio Attorneys that Mr. Barba "believes . . . [the *amparo* ] has an effect on the non-transferability of the property." [37] That evening, Mr. Hernandez responded to Mr. Diaz by pointing out that the document Mr. Diaz had sent indicated the hearing on the "suspension definitive" (permanent injunction) was today, and he enquired: "Hopefully the permanent injunction was granted?" [38] Mr. Hernandez also sent an email to Mr. Diaz asking for a copy of the recorded injunction.[39] Again, Mr. Martin did not come forward to caution the client or, indeed, his colleagues that an "injunction" would violate the ACJ.

Finally, Mr. Martin received a copy of Mr. Hernandez's September 30, 2008 email to Mr. Diaz and others summarizing the "conclusions" made by the various lawyers at a meeting that afternoon, including their "conclusion" to hide the *amparo* and the injunction from Kismet and the Court until they had a recorded copy to "present [to this Court] as an obstacle for transferring title." [40] Mr. Martin testified he was concerned by this email so he had a discussion with Mr. Hernandez. Mr. Hernandez assured him that the *amparo* had no impact on the transfer of the Villa Property. Mr. Martin testified he relied on that discussion to conclude the *amparo* would not block the transfer, and he took no farther actions. Mr. Martin agrees there is nothing in writing memorializing his discussion with Mr. Hernandez.

Based upon the above, the Court can find no clear and convincing evidence that Mr. Martin *personally* acted in bad faith. He did not *personally* advise Mr. Diaz to obtain an injunction preventing transfer of the Villa Property. Mr. Martin advised Mr. Diaz to obtain some type of declaratory relief from a Mexican court advising that Mexican law would not recognize an *involuntary* transfer of the Villa Property into a *fideicomiso* trust ordered by the ACJ. Mr. Martin hoped to present the declaratory ruling to the appellate courts, and to this Court in the likely event of a contempt proceeding, to persuade the United States courts to vacate that portion of the ACJ directing reconveyance of the Villa Property because it would not be recognized in Mexico. His goal was meritorious, and he warned that they must not violate Judge Adler's order. However, because of the many emails and other correspondence he received, Mr. Martin knew that, in the minds of Ms. Valdez and Mr.

---

**35.** Expanded OSC Ex. 57 at DIAZ 2418 (quoting Mr. Barba).

**36.** *Id.*

**37.** Expanded OSC Ex. 59 at DIAZ1845.

**38.** *Id.* at DIAZ1845.

**39.** *Id.* at DIAZ1842–43 (English translation).

**40.** Expanded OSC Ex. 60 at DIAZ4048.

Diaz (and his attorneys in Mexico), his original goal had metamorphosed into one of obtaining an "injunction" preventing the transfer of the Villa Property, thereby *creating* an argument of actual legal impossibility—not just an advisory ruling as he had recommended. While Mr. Martin was negligent in failing to proactively correct their improper goal, he did not *personally* conceal any facts or act in bad faith.

3. ***Enrique Hernandez–Pulido:*** Mr. Hernandez is an attorney licensed in Mexico and in California. His current practice involves representation of clients in international tax planning and related matters. He has a Mexican law degree, two MBA's—one from the University of Texas and one from the Instituto Tecnologico de Estudios Superiores in Monterrey, Mexico and he has an LLM in taxation and international tax policy from Harvard University Law School. His *curriculum vitae* states that he "worked for several years in the Mexican government in the areas of tax, finance and administration. . . ." [41] Mr. Hernandez first became involved with representing the Diaz Defendants on or about August 7, 2008 when he was asked to review certain draft *fideicomiso* trust documents which Kismet had proposed to implement the ACJ.

Further, in mid-August, 2008, while in Mexico City, Mr. Hernandez met with one of Mr. Diaz's attorneys, Arturo Dager. Mr. Dager discussed an August 6, 2008 letter Mr. Diaz had written to the SRE petitioning it to provide an opinion as to the proper actions to take to comply with the ACJ. Mr. Dager indicated that he anticipated the SRE's response would confirm that the ACJ could not be performed. Mr. Hernandez states he had no further involvement with this inquiry to the SRE, except for receiving an email from Mr. Dager on October 1, 2008 informing that the SRE was about to answer the inquiry letter.[42]

Through email copies he received, Mr. Hernandez was aware that Mr. Martin was urging Mr. Diaz to hire the Guerra Firm to institute some sort of declaratory relief action to obtain a statement that the ACJ was contrary to Mexican law.[43] Mr. Martin then told Mr. Hernandez of the telephone conference call on September 15, 2008, stating he believed Mr. Diaz had agreed to hire the Guerra Firm to get the declaratory judgment. On the following day, Mr. Hernandez received an email from Mr. Diaz with the draft of an *amparo* petition. Mr. Hernandez forwarded the email to Mr. Martin, stating, "[t]his is not what we discussed with the Guerra [F]irm nor with Arturo [Dager] in Mexico [C]ity." [44] He informed Mr. Martin it was a "waste of time" since an *amparo* was predicated on homologation of the ACJ, which had not occurred.[45] Mr. Hernandez did not communicate this sentiment to Mr. Diaz directly.

41. Respondents' Ex. W.

42. Expanded OSC Ex. 38 at DIAZ0167. This exhibit also reflects that Mr. Hernandez was privy to Mr. Dager's strategy of getting another department in the SRE to deny any permit to Kismet/Hahn based upon the "response" they would be receiving from the SRE and other information Mr. Diaz would provide to the SRE. Mr. Dager explained that the snag in this strategy was that a transfer to Axolotl (Kismet's proposed assignee), would *not* require a permit so it would be difficult, if not impossible, to block a transfer to Axolotl. While it appears that Mr. Hernandez agreed with Mr. Dager's strategy to block the granting of a permit (see other emails from Mr. Hernandez re permit issues), he did not *personally* facilitate it.

43. *See* Respondents' Exs. P and Q.

44. Respondents' Ex. R.

45. *Id.*

On September 26, 2008, Mr. Hernandez learned from an email sent by Mr. Diaz, and a response which Ms. Valdez sent back to Mr. Diaz, that Mr. Diaz believed Mr. Barba had successfully obtained "admittance" of the *amparo* and they were granted a "cautionary measure (injunction)." [46] Specifically, this email described the "cautionary measure (injunction)" as an order from a federal judge stating that the "transmission of the property cannot be carried out." [47] Although Mr. Hernandez testified that he disagreed with Mr. Barba's assessment of what the *amparo* could accomplish, there is no evidence he expressed his disagreement to Mr. Diaz or Ms. Valdez at that time.

On September 29, 2008, Mr. Hernandez got another email from Mr. Diaz, stating:

This is the part of the Amparo that Andres believes has an effect on the nontransferability of the property. . . .We need the [S]panish speaking US-licensed attorneys to help Geraldine in presenting this in the most favorable perspective. [Expanded OSC Ex. 59 at DIAZ1845]

Mr. Hernandez responded to Mr. Diaz that same evening, asking:

The document you sent us today states that the hearing to determine if the "suspension definitive" is to be granted was to happen today at 10:45 am. Any news on how that went? *Hopefully the permanent injunction was granted?* [*Id.* (emphasis added)]

Mr. Diaz responded by forwarding Mr. Barba's response to Mr. Hernandez's question. Mr. Barba's email explained to Mr. Diaz that unless homologation of the ACJ occurred, the final order on the *amparo* would not issue. But, Mr. Barba

explained his scheme to undertake an alternative action which would have the same effect of clouding title to the property:

TO COMPENSATE THIS ISSUE, WE ARE GOING TO **REGISTER THE AMPARO PROCEEDING** WITH THE PUBLIC REGISTRY OF PROPERTY TO AFFECT THE PROPERTY, WITH THIS WE WILL AVOID THE SAME TO BE FREE FROM LIENS TO BE ABLE TO TRANSFER IT. [*Id.* at DIAZ1843–44 (English translation) (emphasis in original)]

After receiving Mr. Barba's forwarded email from Mr. Diaz, Mr.Hernandez responded again to Mr. Diaz, asking:

Do you have any idea when you could obtain the certificate of recording with the Public Registry of Property and Commerce? We need a copy and preferably apostilled as soon as possible. Also, it will be important to defer the incidental hearing [48] as much as possible to avoid an argument in such sense by Kismet. [*Id.* at DIAZ1843 (English translation)]

When cross-examined about this apparent active solicitation and encouragement of a violation of, or collateral attack on, the ACJ, Mr. Hernandez said it was not his intent do that. Rather, he claims that he was asking Mr. Diaz a series of questions designed to disillusion Mr. Diaz about what an *amparo* could achieve in thwarting transfer of the Villa Property. Mr. Hernandez testified he believed Mr. Diaz would not listen to him if he told him directly that the *amparo* procedure would be ineffective. Mr. Hernandez believed that Mr. Diaz would only listen to Mr.

---

46. Expanded OSC Ex. 57 at DIAZ2418.

47. *Id.*

48. It is believed the "incidental hearing" would have been the final hearing on the *amparo*.

Barba. So, instead of directly discussing his views with Mr. Diaz, Mr. Hernandez decided to ask Mr. Diaz questions which he believed Mr. Diaz would then forward to Mr. Barba, and Mr. Barba's explanations would expose the weaknesses of the *amparo* procedure from Mr. Barba's own mouth.

Mr. Hernandez's characterization of his actions might have some plausibility but for the extraordinary September 30, 2008 email to Mr. Diaz, which he copied to Mr. Martin, Mr. Dager, Mr. Barba and others, memorializing the discussion at a meeting among several of the Diaz Defendants' United States counsel. Mr. Hernandez relates:

Dear Alex,

We had a meeting with Steve [Morris], Tony [Gaston], Geraldine [Valdez] and Me and *I explained to them the amparo resolution you obtained and how the injunction order can be recorded* in the Public Recorder's Office. We concluded that:

1) *We will not let the U.S. court nor Kismet's attorneys at this point know that the amparo was filed and the injunction was obtained.* We want to avoid Kismet arguing against it until we have it recorded. We will want to have the certificate of recording of the amparo judge's order handy when it is available to *present it as an obstacle for transferring title* .... [Expanded OSC Ex. 60 at DIAZ4048 (emphasis added) ]

When asked about this email, Mr. Hernandez denied that he ever intended what it stated. He claims he intended this portion of the email to politely inform Mr. Diaz that the *amparo* would be ineffective, and that he should not pursue this course of action by way of recording it.[49] Mr. Hernandez concedes this email is badly worded; it does not even remotely state what he claims he intended to communicate. Given Mr. Hernandez's extensive education in this United States, including a degree from Harvard Law School, his excuse that English is not his first language is not a credible justification. Further, his decision to conceal the *amparo* from opposing counsel and the Court until it could be recorded was a breach of his duty of candor owed to this Court and opposing counsel.[50]

When asked whether he was concerned that Mr. Diaz's actions were a violation of the ACJ or the Order Continuing Preliminary Injunction, Mr. Hernandez testified he was unaware of the Order Continuing Preliminary Injunction until sometime in late October 2008; indeed, he never read it, relying instead on Ms Valdez's explanation of its terms. After Ms. Valdez explained the Order Continuing Preliminary Injunction, he claims he told her that the *amparo* is "nothing" because it only could become effective if action were taken in violation of the Mexican Constitution.

In mid-October 2008, Kismet learned of Mr. Diaz's *amparo* proceeding and sent Ms. Valdez a "cease and desist" letter. Ms. Valdez turned to Mr. Hernandez for assistance in framing a response and Mr. Hernandez replied to Ms. Valdez, in part, by saying: "Since no enforcement actions have been taken in Mexico (as far as I know), the Amparo probably already (or will likely be in the near future) negated."[51] Then, at Ms. Valdez's request, Mr.

---

49. D.E. # 765, Hernandez Decl. at ¶ 29.

50. *See* Bus. & Prof.Code § 6068; *see also* *Hallinan v. State Bar of Cal.,* 33 Cal.2d 246, 249, 200 P.2d 787 (1948).

51. Respondents' Ex. Z at DIAZ3815.

Hernandez responded to Kismet's "cease and desist" letter. He wrote:

> Under Mexican law, the "Amparo" process is used to guarantee that acts from Mexican authorities are carried out as prescribed by the Mexican Constitution. *Mr. Diaz commenced this action assuming that Kismet had properly commenced, or was in the process of commencing, an action in a Mexican Court for recognition of the Consolidated Judgment* ....
>
> Since, as far as I know, Kismet has not commenced any enforcement action in Mexico nor has it intervened in the Amparo Action, such action has probably already (or will likely be in the near future) be dismissed automatically. Of course, I am not in control of this proceeding....
>
> *Such an action does not violate the preliminary injunction issued by the Court in this case.* [Respondents' Ex. AA (emphasis added)]

Mr. Hernandez's claim that Mr. Diaz believed Kismet had commenced, or was in the process of commencing, an action to homologate the ACJ is disingenuous. Mr. Hernandez knew Mr. Diaz did not believe Kismet was in the process of homologating the ACJ; indeed, Mr. Diaz's impossibility defense hinged upon Kismet's demanding performance of the ACJ *without homologating it.* Additionally, Mr. Hernandez knew from the series of emails discussed above that Mr. Diaz (and Ms. Valdez) intended the *amparo* to block the transfer of the Villa Property—an action which would clearly have violated the Order Continuing Preliminary Injunction. Given what he knew, Mr. Hernandez's failure to acknowledge the *appearance* of wrongdoing, or to

offer to investigate whether the *amparo* had been dismissed, is bad faith.

The Court is extremely troubled by the content of many of Mr. Hernandez's written communications. Taken as a whole, they demonstrate he was not acting in good faith. However, the Court must also consider that Mr. Hernandez was not the originating attorney; nor was he the attorney in charge of handling the bankruptcy aspects of Mr. Diaz's representation. His involvement was sporadic and he had little control over Mr. Diaz's decisions, or Ms. Valdez's advice to Mr. Diaz because she was the "point person" handling these proceedings. Specifically, Mr. Hernandez reviewed the proposed transfer documents because of his prior experience dealing with *fideicomiso* trusts; he met with Mr. Dager while he was in Mexico City to discuss Mr. Dager's strategy in Mexico and communicated with Mr. Dager thereafter;[52] he translated documents and other communications sent by Mr. Diaz and his attorneys in Mexico because of his fluency in English and Spanish; and he provided legal advice on other international issues. But, Mr. Diaz was also receiving advice on these issues from others, including Mr. Dager, Mr. Barba and Mr. Martin. Mr. Hernandez correctly recognized Mr. Diaz would not likely listen to his advice on the international issues, and he properly deferred to Ms. Valdez to handle the bankruptcy aspects of the case.

Although the Court has struggled with the issue, it has decided *not* to impose a joint and several liability sanction against Mr. Hernandez for his bad faith conduct in these bankruptcy proceedings. Although his conduct certainly crossed the line into sharp practice, he did not have enough control over the handling of these proceed-

---

**52.** Mr. Hernandez's declaration gives the false impression his only subsequent communication with Mr. Dager was receipt of the October 1, 2008 email. [*Compare* D.E. # 765, Hernandez Decl. at ¶¶ 15–17; Expanded OSC Ex. 18 at DIAZ2626]

ings to hold him jointly responsible for the bad faith conduct of Ms. Valdez, Mr. Diaz and Mr. Diaz's attorneys in Mexico. Critically. Mr. Hernandez did not *personally* advise Mr. Diaz to obtain an injunction; he did not *personally* advise or support the filing of the *amparo* proceeding, although he did encourage having it recorded to present to this Court as an "obstacle for transferring title"; and he did not *personally* defend Mr. Diaz in these bankruptcy proceedings except for filing a declaration in which he set forth his understanding of why the transaction could not be accomplished under Mexican law. However, it is now obvious the Villa Property could be reconveyed to a *fideicomiso* trust because, once the Court raised the financial stakes high enough, the Diaz Defendants executed the transfer documents and the transaction closed before a notary in Mexico who reviewed the transfer documents, and the ACJ, and approved them as being legally sufficient. Whether the transaction will withstand a challenge in the courts of Mexico is unknown. [*See* Consolidated FFCL ¶ 108]

Notwithstanding, some type of sanction is warranted. Mr. Hernandez passively acquiesced in, and arguably encouraged, Mr. Diaz's conduct in attempting to block the ACJ; he set forth a scheme to conceal the *amparo* (injunction) from the Court and opposing counsel until it was recorded; and he made factually false and disingenuous statements to Kismet in responding to its "cease and desist" letter. The Court concludes that Mr. Hernandez is in need of a refresher course on his ethical responsibilities and duties as an attorney admitted to the California State Bar. The Court will require Mr. Hernandez to attend at least 20 hours of Continuing Legal Education in "ethics." Within two weeks following entry of this Memorandum Decision, Mr.

Hernandez must file a plan with this Court listing the dates, course names and hours of credit for each of the courses he intends to take to meet this obligation. Further, upon completion of his obligation, Mr. Hernandez is to provide certification of his hours spent in this endeavor to this Court by declaration under penalty of perjury. This will provide Mr. Hernandez with the opportunity to rehabilitate his reputation with the Court.

### D. *Knowledge of the Order Continuing Preliminary Injunction.*

None of the Procopio Attorneys quarrel with the proposition that the act of obtaining an "injunction" preventing the transfer of the Villa Property would violate the Order Continuing Preliminary Injunction. However, they claim that none of them knew about the Order Continuing the Preliminary Injunction during the relevant months.

Ms. Valdez could not consistently recall when she first learned of the Order Continuing Preliminary Injunction. Ms. Valdez started her testimony by stating she "became aware of it in probably about October of 2008." [53] Thereafter, Ms. Valdez claimed she never saw the Order Continuing Preliminary Injunction until *January 200* . Specifically, she testified:

> [T]o be honest with your Honor.... I really do not think I saw that order [Continuing Preliminary Injunction] until maybe last week, when it was brought up at this previous hearing on the 6th of January, when it was mentioned during last week's hearing and we went back to the office and Mr. Isaacs downloaded it. I don't think I had ever seen that order before. [Expanded OSC Hr'g Tr., 71:6–13, Jan. 13,2009]

---

53. Expanded OSC Hr'g Tr., 12:5–10, Jan. 13, 2009.

In response to this claim, the Court questioned and Ms. Valdez responded:

> Court: Surely ... you must have known about it [the Order Continuing Preliminary Injunction] before that, Ms. Valdez, because there was an OSC re: the violation of the preliminary injunction. [*Id.* at 71:15–17]

> Ms. Valdez: The very first argument that I made in that preliminary injunction [opposition] was the preliminary injunction had been dissolved as soon as the judgment was entered, because preliminary injunctions dissolve unless they're continued. [*Id.* at 71:18–22]

The docket reflects that Ms. Valdez filed the opposition to the OSC Re: Violation of Order Continuing Preliminary Injunction on November 14, 2008.[54] Therefore, she testified she did not know about the Order Continuing Preliminary Injunction until *after* November 14, 2008 and perhaps not until January 2009.

Because of Ms. Valdez's incredible testimony, on January 15, 2009, the Court asked Russell Reynolds ("Mr.Reynolds"), the Court's Director of Information Systems, to obtain the Procopio Law Firm's public electronic document access system ("Pacer") activity report for these adversary proceedings for the months of June and July 2008. Mr. Reynolds testified he obtained a complete report of all Pacer activity for these adversary proceedings for these two months. He downloaded the complete report into an Excel spreadsheet, and eliminated all Pacer activity except the activity downloaded by the Pacer account number assigned to the Procopio Law Firm ("Procopio Pacer Report").[55] Mr. Reynolds then confirmed that the activity in the Procopio Pacer Report was billed to the Procopio Law Firm and the bills were paid without any disputes.

The Procopio Pacer Report reflects that on June 9, 2008, someone at the Procopio Law Firm downloaded the Consolidated FFCL and the Consolidated Judgment. Thereafter, on June 30, 2008, someone at the Procopio Law Firm downloaded nine documents comprising all pertinent post-judgment filings (and rulings) during the month of June 2008, including Kismet's emergency motion to clarify, and the resulting Order Continuing Preliminary Injunction.[56] The documents were downloaded by someone at the Procopio Law Firm who did not bill for their time.

The Court accepts the testimony that none of the Procopio Attorneys *personally* downloaded these documents on June 30, 2008. Ms. Valdez confirmed she likely did access the Pacer docket in June and July to review these adversary proceedings, but she was out of the country on June 30, 2008. She is certain she never saw the Order Continuing Preliminary Injunction on the docket even though Kismet's motion to clarify was filed the same day as the Diaz Defendants' motion to amend (documents she reviewed), and the docket entries numerically follow each other. Ms. Valdez claims the docket was too voluminous to notice the Order Continuing Preliminary Injunction. Both Mr. Martin and Mr. Hernandez testified they do not know how to use this Court's Pacer system. Additionally, the Court questioned Kendra Hall ("Ms.Hall"), another Procopio attorney who billed time on June 30, 2008, who also testified she does not know how to use this Court's Pacer system.

The Court rejects the suggestion that the June 30, 2008 downloads were random

---

54. D.E. # 655.

55. Court's Notebook at Tab 10.

56. A complete list of the documents downloaded on June 30, 2008 is attached hereto as Appendix 1.

and *anybody* at Procopio could have accidentally done it. The documents were too targeted in scope to be random. The testimony confirms that not everyone at Procopio knows how to use this Court's Pacer system. Thus, it is likely the documents were downloaded by a secretary in the bankruptcy department for use by the attorneys working on the case. It is admitted that the secretaries know how to access the Court's Pacer system, and there are no billing entries for secretarial time in the billing records.[57]

Mr. Reynolds testified he could identify the precise computer used on June 30, 2008 to download the documents with the assistance of the Procopio Law Firm's information technology staff However, the Court will allow this to remain a mystery since the Procopio Pacer Report reflects five more downloads of the pleadings in July 2008. The entire motion and the Order Continuing Preliminary Injunction were downloaded again on July 29, 2008 from adversary proceeding 06–90369.[58] Then, the entire motion was downloaded again on July 31, 2008 from adversary proceeding 04–90392.[59] Ms. Airman billed 1.5 hours to oversee the download of these documents; she testified the purpose of these downloads was to create working binders for Ms. Valdez to keep in her office. Once the task was completed, she testified the binders were placed in Ms. Valdez's office. It is not credible that Ms. Valdez did not review the pleadings in these binders.

Additionally, Ms. Valdez's testimony is not credible because the Order Continuing Preliminary Injunction was discussed by Kismet and attached as an exhibit to Kismet's *Ex Parte* Application for Order to Show Cause Re: Contempt for Violation of the ACJ filed *September 28, 2008* ("OSC Re: ACJ").[60] As an electronic filer, Ms. Valdez received instant email notification of this *ex parte* application and the resulting OSC Re: ACJ. Moreover, Ms. Valdez acknowledges playing a primary role in preparing the Diaz Defendants' opposition to the OSC Re: ACJ, and she defended Mr. Diaz at the October 22, 2008 contempt hearing. It is not credible that Ms. Valdez would defend a contempt motion without reading the underlying pleadings or reviewing the attached exhibits. The Court finds that her failure to acknowledge wrongdoing in early October, and take corrective action at that time, has unreasonably and vexatiously multiplied the proceedings before this Court.

Further, on November 7, 2008, Kismet filed an *Ex Parte* Application for Order to Show Cause Re: Violation of the Order Continuing Preliminary Injunction.[61] The title plainly provides the Order Continuing Preliminary Injunction was the basis for this contempt motion. Ms. Valdez assisted in preparing the Diaz Defendants' opposition to this contempt motion, and she appeared on Mr. Diaz's behalf at the hearing on November 20, 2008. Again, it is not credible that Ms. Valdez would defend this contempt motion without reviewing the underlying pleadings which quoted the lan-

57. Beverly Altaian ("Ms.Altman"), a paralegal at the firm, testified the secretaries' time is not generally billed separately. The billing records and the testimony confirm the attorneys and paralegals would most likely have billed for their time if they had accessed the Pacer docket.

58. Court's Notebook at Tab 10 (D.E.# 216, # 217, # 223).

59. *Id.* (D.E.# 216, # 217).

60. D.E. # 570 (discussing the Order Continuing Preliminary Injunction at pages 5–6 and in footnote 2, and attaching it as Ex. "A").

61. D.E. # 632.

guage of the Order Continuing Preliminary Injunction and attached the order itself as Exhibit 1 to the pleadings. Ms. Valdez's claim that she first saw the Order Continuing Preliminary Injunction in *January 2009* is not truthful.

Given the totality of the evidence, the Court accepts that Mr. Martin and Mr. Hernandez were likely not aware of the Order Continuing Preliminary Injunction during the relevant time period addressed in the Expanded OSC. However, the Court finds clear and convincing evidence that Ms. Valdez knew or should have known of the Order Continuing Preliminary Injunction during this time period, but she likely did not consider whether *her personal* conduct was violating it. There is clear and convincing evidence that Ms. Valdez intended to obtain an "injunction" preventing the transfer of the Villa Property ordered in the ACJ. Regardless, the Court did not need to enter an Order Continuing Preliminary Injunction to render her attempts to block the transfer improper.

### III.

### ANALYSIS

■ It is settled law that a bankruptcy court has the inherent authority to sanction an attorney who vexatiously multiplies the proceedings before it. *In re Dyer*, 322 F.3d 1178, 1196 (9th Cir.2003); *In re Rainbow Magazine, Inc.*, 77 F.3d 278, 283–84 (9th Cir.1996); *see also In re Volpert*, 110 F.3d 494, 500–502 (7th Cir.1997). The issue of a court's inherent authority to sanction was addressed by the Supreme Court in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42–47, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). The Supreme Court stated:

It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a

Court, because they are necessary to the exercise of all others." For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."

*Id.* at 43, 111 S.Ct. 2123 (citations omitted).

■ Because of their very potency, the inherent sanctions powers must be exercised with restraint and discretion. *Chambers*, 501 U.S. at 44, 111 S.Ct. 2123. Notwithstanding, if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess sanctions against the responsible party. *Chambers*, 501 U.S. at 46, 111 S.Ct. 2123 (citation omitted). The imposition of sanctions in this instance "transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself. . . ." *Id.*

■ A bankruptcy court's inherent authority to sanction is recognized by the statutory grant in § 105(a). *Dyer*, 322 F.3d at 1196–97; *Rainbow Magazine*, 77 F.3d at 284–85; *Volpert*, 110 F.3d at 500–502. Section 105(a) states:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or im-

plement court orders or rules, or to prevent an abuse of process.[62]

The plain language of § 105(a) grants to a bankruptcy court broad authority, including *sua sponte* authority, to impose sanctions to enforce and implement its own orders or rules, or to prevent abusive litigation tactics, so as to achieve the orderly and expeditious disposition of the cases before it. *See Rainbow Magazine,* 77 F.3d at 284–85; *Volpert,* 110 F.3d at 500. Specifically, a bankruptcy court can use § 105(a) to sanction a debtor, an attorney, or anyone else directly or indirectly involved in the bankruptcy proceedings, for engaging in litigation tactics which violate a court order, or unreasonably and vexatiously multiply the proceedings before it. *See Volpert* at 500 (sanctions issued against attorney); *Rainbow Magazine,* 77 F.3d at 284–85 (sanctions issued against debtor and nonparty who directed debtor's bad faith bankruptcy filing); *see also Knepper v. Skekloff,* 154 B.R. 75, 80 (N.D.Ind.1993) (sanctions issued against a debtor and his attorney); *In re Silver,* 46 B.R. 772, 774 (D.Colo.1985) (sanctions issued against debtor). As the court in *Silver* explained:

> Especially in these days where the number of proceedings in the federal courts continue to rise, the Court concludes

that [inherent] sanctions such as those imposed in this matter are necessary in order to protect the integrity of the Bankruptcy Code as well as the judicial process.

*Id.* at 774.

▮ Prior to using its inherent sanctions authority, a court must make an explicit finding of bad faith or other willful misconduct. *Dyer,* 322 F.3d at 1196; *Primus Automotive Financial Services, Inc. v. Batarse,* 115 F.3d 644, 648 (9th Cir. 1997).[63] The bad faith or other willful misconduct must consist of "something more egregious than mere negligence or recklessness." *Dyer* at 1196 (citation omitted). A court must find a specific bad faith intent, or other conduct tantamount to bad faith, to impose sanctions under its inherent authority. *Id.* Conduct which delays or disrupts the litigation or hampers the enforcement of a court order demonstrates bad faith. *Primus,* 115 F.3d at 649 (citation omitted).

▮ Rarely, will an attorney facing sanctions admit to acting in bad faith. *Cf. Volpert,* 110 F.3d at 497 (wherein the attorney admitted he intended to unreasonably and vexatiously multiply the proceedings because he believed the bankruptcy

---

**62.** Bankruptcy courts within this circuit also possess the authority to sanction attorneys for bad faith litigation tactics pursuant to 28 U.S.C. § 1927 because bankruptcy courts are not separate courts from the district court, but are part of it. *GRiD Systems Corp. v. John Fluke Mfg. Co., Inc.,* 41 F.3d 1318, 1319–20 (9th Cir.1994), Here, the Court is utilizing its inherent sanctions power codified in § 105(a) for its authority to impose sanctions for the bad faith litigation tactics that occurred in these adversary proceedings.

**63.** *But see In re Lehtinen,* 332 B.R. 404, 415 (9th Cir.BAP2005) (recognizing that in the Ninth Circuit, the "bad faith" requirement does not necessarily extend to every possible exercise of attorney discipline, and a court

may exercise its inherent sanctions authority upon a finding of willfulness, recklessness, or other fault by the offending party, particularly where the court is acting to protect the general public). Although the Ninth Circuit has not yet resolved the issue of the applicable burden of proof for imposing inherent sanctions, the Court will follow the majority of courts by applying the clear and convincing evidence standard of bad faith. [*See* Response at n. 5] This higher evidentiary standard is consistent with the Standards for Imposing Lawyer Sanctions adopted by the American Bar Association ("ABA") available on the ABA's website at <www.abanet.org/cpr/regulation/standards_sanctions.pdf.>

court lacked the authority to sanction him). In the absence of an admission, bad faith must be demonstrated by the totality of the circumstantial evidence.

### A. Bad Faith is Demonstrated by Violation of the California Rules of Professional Conduct and District Court Local Rule 83.4(b).

 The California Rules of Professional Conduct provide guidance in determining whether to impose inherent sanctions for attorney misconduct. *See Lehtinen,* 332 B.R. at 409–410 (acting pursuant to its inherent authority to sanction attorney for violations of the California Rules of Professional Conduct); *In re Alvarado,* 363 B.R. 484, 491–92 (Bankr. E.D.Va.2007) (applying the Virginia Rules of Professional Conduct). Specifically, Southern District of California Local Rule 83.4(b) adopts the standards of professional conduct required by members of the California State Bar, and the decisions of any court applicable thereto, as the applicable standards of professional conduct within this judicial district; Local Bankruptcy Rule 1001–3 adopts District Court Local Rule 83.4(b) to proceedings in the bankruptcy court. Further, District Court Local Rule 83.4(b) provides that:

No attorney permitted to practice before this court shall engage in any conduct which degrades or impugns the integrity of the court or in any manner interferes with the administration of justice therein.

In the present case, the Expanded OSC alleged a violation of District Court Local Rule 83.4(b). It alleged that the attorneys collectively participated in misleading acts, concealment of material facts and other acts of moral turpitude in violation of California Business & Professions Code §§ 6068(a)-(d). And, it alleged that the attorneys violated California Rule of Professional Conduct 3–210 which provides:

A member shall not advise the violation of any law, rule, or ruling of a tribunal unless the member believes in good faith that such law, rule, or ruling is invalid. A member may take *appropriate steps in good faith* to test the validity of any law, rule or ruling of a tribunal.

(Emphasis added); *see also* ABA Model Rule 3.4(c).

The Expanded OSC sets forth conduct which the Court believes violates the above rules, including:

• Interposing objections to the form of the transfer documents to cause delay until they could "get their ducks in a row in Mexico" when the attorneys knew their clients had no intention of signing any transfer documents;

• Violation of the Order Continuing the Preliminary Injunction by filing an *amparo* proceeding to obtain a self-imposed injunction to block the transfer of the Villa Property and scheming to conceal this proceeding from Kismet and the Court until the injunction was recorded; and

• Advising their clients to take actions in Mexico intended to obstruct their ability to perform the ACJ.

The Court has carefully reviewed the Response to the Expanded OSC, including the declarations of each of the Procopio Attorneys. It has also carefully reviewed the testimony from the evidentiary hearing and the Procopio Attorneys' explanations as to what happened. The Court concludes by clear and convincing evidence that Ms. Valdez engaged in the above-cited inappropriate conduct in these proceedings. Further, it finds that Ms. Valdez acted in conscious bad faith.

The Procopio Attorneys have cited many cases recognizing that an attorney should

not be sanctioned for giving erroneous legal advice. However, these cases involved situations where the attorney provided the erroneous advice in *good faith* with the honest belief that the advice was legitimate and well founded. *Cf. Maness v. Meyers*, 419 U.S. 449, 467–68, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975); *see also Chula v. Superior Court of Orange County*, 109 Cal. App.2d 24, 39–40, 240 P.2d 398 (1952). Moreover, in *Maness*—the case most heavily relied upon—the erroneous advice (given in good faith) involved protection of a client's Constitutional right against self-incrimination. *Id.* at 461–466, 95 S.Ct. 584. After reviewing the ancient "roots" of this Constitutional right and the important place this privilege occupies in the U.S. Constitution, the Supreme Court concluded:

> The privilege against compelled self-incrimination would be drained of its meaning if counsel ... could be penalized for advising his client in good faith to assert it. The assertion of a testimonial privilege, as many other rights, often depends upon legal advice from someone who is trained and skilled in the subject matter, and who may offer a more objective opinion. A layman may not be aware of the precise scope, the nuances, and boundaries of this Fifth Amendment privilege.... If performance of a lawyer's duty to advise a client that a privilege is available exposes a lawyer to a threat of contempt for giving honest advice it is hardly debatable that some advocates may lose their zeal for forthrightness and independence.

*Id.* at 465–66, 95 S.Ct. 584

The present case does not involve erroneous advice given in good faith to protect a U.S. Constitutional right; nor does it involve a situation where the attorney acted with honesty and forthrightness. Ms.

Valdez's written words reflect that she intentionally delayed performance of the ACJ (for several months) until they could get their "ducks in a row in Mexico" to *create* their defense of impossibility. She intentionally interposed objections to the proposed transfer documents to force Kismet to change them when her client had stated he had no intention of signing any transfer documents. Ms. Valdez had facially meritorious objections to these documents, but her motive in raising the objections was mixed with bad faith.

Ms. Valdez's written words also reflect that she repeatedly advised and encouraged her client to immediately obtain an "injunction" preventing the transfer of the Villa Property. Ms. Valdez did not understand the true function of an *amparo* proceeding, but she understood how an "injunction" functions. As she stated, an injunction "tells somebody that they can't do something." [64] Thus, by Ms. Valdez's own words, she *advised her client to obtain* a Mexican court order telling him he could not perform the ACJ. Further, Ms. Valdez violated the Order Continuing Preliminary Injunction which included "attorneys" within its scope of the persons to be enjoined. The Court has explained why it rejects Ms. Valdez's claim that she was unaware of the Order Continuing Preliminary Injunction during the relevant time period. The totality of circumstances demonstrate she was aware of the Order Continuing Preliminary Injunction, but she likely did not consider whether her *personal* actions were violating it.

It is readily apparent (and the Procopio Attorneys now concede) that performance of the ACJ was never truly impossible to complete. As such, Ms. Valdez's obligation was to advise her client he must *promptly* comply with the ACJ since it

---

**64.** Expanded OSC Hr'g Tr., 19:4, Jan. 13, 2009.

was not stayed. Although Ms. Valdez advised her client to comply, she also advised him how to make compliance impossible (get an injunction preventing the transfer of the Villa Property), and assured him that she would do everything she could to get a successful result.[65] Accordingly, the Court concludes that Ms.Valdez took inappropriate steps in bad faith to challenge the validity of the ACJ. Her conduct has degraded and impugned the integrity of this Court, and interfered with this Court's administration of justice by unreasonably and vexatiously multiplying the proceedings before this Court.

### B. *The Sanction is Reasonable.*

In cases of attorney disciplinary sanctions, the Court must review the sanction it has imposed to determine if it is reasonable applying the standards set forth in the ABA Rules of Professional Conduct. *In re Brooks–Hamilton,* 400 B.R. 238, 252–53 (9th Cir. BAP 2009); *In re Lehtinen,* 332 B.R. at 416–17.[66] Pursuant to the ABA Standards, the factors to be considered in determining an appropriate sanction are:

1. Whether the duty violated was to a client, the public, the legal system, or the profession;

2. Whether the lawyer acted intentionally, knowingly, or negligently;

3. Whether the lawyer's misconduct caused serious or potentially serious injury; and

4. Whether there are aggravating and/or mitigating factors.

*Lehtinen,* 332 B.R. at 416 (citation omitted). As *Lehtinen* explained:

Aggravating factors include considerations which justify an increase in the degree of discipline imposed, such as a dishonest or selfish motive, refusal to acknowledge [the] wrongful nature of [the] conduct, and the vulnerability of the victim. Mitigating factors, for example, the absence of a prior disciplinary record and imposition of other sanctions, may justify a reduction in the degree of discipline.

*Id.* at 416–17 (citations omitted).

In the present case, the Court is imposing upon Ms. Valdez the sanction of joint and several liability with her client to Kismet for the following compensatory sanctions ordered at the hearing on November 13, 2008: [67]

● Loss of use of daily rental value in the amount of $4,158.00 U.S. per day, retroactive to September 9, 2008 through and including November 13, 2008;

● Loss of use of property at the rate of $205.48 per day, retroactive to September 9, 2008 through and including November 13, 2008; and

● All of the attorney's fees and costs awarded to Kismet in the order granting fees and expenses pursuant to the hearing on the Order to Show Cause Re: Violation of ACJ[68] through and including November 13, 2008.

The Court is imposing this sanction pursuant to its inherent authority recognized in § 105(a). However, since the sanction functions to discipline attorney misconduct, the Court believes it must also consider the ABA Standards to determine its reasonableness. In weighing the factors, the Court finds the sanction is reasonable. Ms. Valdez's conduct in these proceedings violated her duties owed to the public, the

---

65. Respondents' Ex. N.

66. *See* note 63, *supra.* (ABA website).

67. D.E. # 710 (¶¶ 1(A)-(i)-(iii)).

68. D.E. # 752.

legal system and the legal profession. She acted knowingly and intentionally, as opposed to negligently, to *create* an "injunction" to block performance of the ACJ. Ms. Valdez's conduct has caused hundreds of thousands of dollars of injury to Kismet, and it has injured this Court by, at times, interfering with the efficient administration of justice in this Court while it dealt with the numerous requests to compel the Diaz Defendants to comply with the terms of the ACJ. If this type of conduct were permitted to occur, it would pose a serious threat to the general public and the efficient functioning United States judicial system.

The Court understands that Ms. Valdez has never been the subject of a prior disciplinary action or, to this Court's knowledge, sanctions for attorney misconduct. She works at a law firm that has an impeccable reputation with the Court. The Court recognizes Ms. Valdez honestly believes the transfer ordered in the ACJ will be overturned by a court in Mexico. However, Ms. Valdez practices law in the United States, not in Mexico. She lost her way as to how to appropriately challenge the validity of the ACJ in the United States legal system.

## IV.

### CONCLUSION

The Court finds by clear and convincing evidence that Ms. Valdez took actions in bad faith to inappropriately challenge the ACJ. Her conduct has degraded and impugned the Court, and interfered with its administration of justice by unreasonably and vexatiously multiplying the proceedings before it. The Court concludes that a reasonable sanction for her conduct is to hold her jointly and severally liable with her client for the sanctions

ordered at the hearing on November 13, 2008, as more fully set forth above. The Court finds Mr. Hernandez also engaged in bad faith conduct, but it will impose a lesser sanction of ordering him to attend at least 20 hours of Continuing Legal Education in "ethics." The Court finds that Mr. Martin, although negligent, should not be sanctioned for his conduct in these proceedings. The Court will enter a separate order based on this Memorandum Decision.

### *APPENDIX 1* *

| Case No. | Docket | Date | |
|---|---|---|---|
| 06–90369 | 213 | 06/02/08 | Consolidated Judgment |
| 04–90392 | 521 | 06/19/08 | Order Granting Defendants' Emergency Ex Parte Application |
| 04–90392 | 514 | 06/16/08 | Order Granting Kismet's Application for Order Clarifying Consolidated Judgment |
| 04–90392 | 512 | 06/16/08 | Defendant's Emergency Ex Parte Request For Stay of Enforcement of Judgment Pending Determination of Motion to Alter Or Amend Judgment and for Further Findings |
| 06–90369 | 230 | 06/19/08 | Order Granting Defendants' Emergency Ex Parte Application |
| 06–90369 | 219 | 06/13/08 | Notice of Motion and Motion to Alter or Amend Judgment and for Further Findings |
| 06–90369 | 216 | 06/12/08 | Plaintiff Kismet Acquisition LLC's Emergency Ex Parte Application for Order Clarifying Consolidate Judgment Pursuant to Fed. R. Bankr.Proc. 7052(b) |
| 06–90369 | 214 | 06/12/08 | Defendant's Motion to Alter or Amend Judgment and for Further Findings |
| 06–90369 | 232 | 06/26/08 | Opposition to Diaz Defendants' Motion to Alter or Amend Judgment and for further findings |

* Documents downloaded by Procopio Law Firm on 6/30/2008